The last case today, No. 231501, Nantucket Residents Against Turbines et al. v. U.S. Bureau of Ocean Energy Management et al. Will Attorney Stavola please come up and introduce yourself for the record? Yes, good morning. Thomas Stavola on behalf of Appellants Nantucket Residents Against Turbines. I'd like to reserve two minutes for rebuttal. Yes, you may. Thank you. May it please the Court, Vineyard Wind One wind energy project was recklessly placed within the critical habitat of the rapidly declining North Atlantic right whale. Ninety-three percent of the remaining North Atlantic right whales rely upon the small region within which the project is located. And egregiously, Vineyard Wind's own final environmental impact statement concedes that the offshore wind projects, including their own, will have no collective impact on global warming. Yet, this project will threaten the continued survival of the North Atlantic right whale. In fact, the statistics show that from 2014 to 2015, there was a 40 percent increase in North Atlantic right whale deaths, and that was coterminous with the Block Island Wind Farm's development. Now, the Block Island Wind Farm was a much smaller size versus a Vineyard Wind, but what we're likely to see is an even larger impact. But counsel, of course, there is an issue of protecting the right whales. And again, this Court, actually this same panel, we've had a case where we applied a statute and the benefit that stopped lobster fishing for a while regulation. But here, I think the issue is, did the agency act correctly? Did it follow its procedures and the rulemaking process and the permit process? And it would appear to me that the steps were taken, there was public notice, comment. How is that process invalidated? Because again, it's not a perfect world, perhaps. Decisions have to be made, but it seems to me that when the decision was made here, you know, we owe some deference to the way it was made. The important aspect here we would contend is that pursuant to Section 782 of the Endangered Species Act, the agencies failed to ensure that the North Atlantic right whale's continued survival would not be jeopardized. And they did that through glaring errors in their environmental review documents, the biological opinion, the FEIS, and there were these compelling errors. The case law states that if agencies failed to consider pertinent facts or offer explanations that run counter to the evidence before the agency, that action can be deemed arbitrary and capricious. It might be helpful if you picked out what you submit is the most glaring error and start with that rather than just categorizing them all. So as far as those most glaring errors, the first of which is the agency's flawed reliance on highly ineffective mitigation protocols. And if I could just briefly... But the agency did consider the mitigation protocols, and it heard from whoever it had to hear. They considered mitigation protocols, but the mitigation protocols, if they're analyzed both in isolation and synergy, are ineffective. So as we pointed out in our briefing, there's only a 9% detection efficacy for protected species observers, who are the individuals who stand on the platforms and look out at the surface of the water to detect whales. But there are many a litany of errors and deficiencies in that process. And passive acoustic monitoring, as we noted in the briefing, only possesses a 25% detection efficacy. So even when these are considered in synergy, that's still a very low efficacy level. And the other issue... When you say that's low, what's your... I mean, if you were talking about in synergy 25 plus 9, and you're talking about a major league baseball hitter, that'd be a pretty efficacious efficacy. Why do you say this is low here when you consider what is being protected against? In the context of an endangered whale, which the population is now 350 and rapidly declining, at 93% of those whales rely on the small... Right, but the non-detection doesn't equate to death. Well, non-detection... Or even injury. Non-detection does not automatically equate to death. Right, so... Non-detection will raise the probability significantly. The point is simply, if you're using detection to guard against a fatality, then you might have a lot higher demands for the efficacy of the detective mechanisms. But if you're using detection as an add-on of one of the things that you're trying to do to mitigate annoyance, efficacy might be thought of very differently. And why can't the agency make that policy judgment as to what degree of efficacy is needed given the endpoints that are being guarded against? Well, the issue is that if you consider the mitigation protocols even in synergy, for example, the vessel speed reductions, they do not apply to crew transfer vessels, which can travel up to 25 knots. Those are exempt. The seasonality restrictions, which we emphasized in the briefing... Can I just stop you? The platforms have been built. It may be that the various measures about controlling vessel speed to the platform are all moot. But I think what you're saying is because you can't actually detect very well more than 34% at best, 25 plus 9, there are no mitigation measures that will work. Is that your bottom line argument? The contention is that as it is, the mitigation protocols are grossly efficient in guarding against injury. OK. In your hypothetical world, are there mitigation measures other than no vehicles, no fishing lines can be allowed in this area because there are so many right whales who come to feed in the area? Are there any mitigation measures that you are arguing for that you say the agency just ignored? Or is it your position that there really are no mitigation measures and everything has to be stopped in the area? One of the contentions is that the mitigation measures that the agencies rely on are ineffective. But to the extent that they continue to rely on those, I would suggest that increased saturation of the passive acoustic monitoring and increased saturation of the protected species observers would at least somewhat reduce the low efficacy but not cure it entirely. However, there needs to be a complete redo of the environmental analysis, which the BIOP was already redone, the 2020 version was redone for 2021. So we contend that those review documents should be reviewed and redone a second time to consider the contentions of appellants have raised in the briefing. You seem not to be answering my question. On the present state of the record, are you would work and that you prove that case to the agency? I would generally concur with that, yes, that as it is, the mitigation measures are not concurring. Is that your position? It is our position that the mitigation measures adopted by the agencies are insufficient. And then if that is your position, what follows from that? What remedy do you want? The remedy that we have requested is first a reversal of the summary judgment denial, but also for the approval of vineyard wind to be set aside while the environmental review documents are reprepared in a way that the appellants have asserted. Okay, the platforms have been built. It's about to be operational. Is that correct? The pile driving is nearly complete at this point. All right. And what you're saying is you want everything to stop and you want the agency just to start all over again? A redo of the biological opinion and the final environmental impact statement as both of those documents contain grave flaws. Okay, my next question, as you understand it, what are the ongoing monitoring requirements that the agencies will be requiring as the rest of the project becomes operational? Well, that is in fact one of the deficiencies associated with this because in the operational noise phase, those mitigations are not present. Are you saying there are no ongoing study requirements, information requirements? Not that there are no requirements. There is subject to terms and conditions in the Because, for example, the operational noise issue that we raised in the brief, the Stover study was completely dismissed by the agencies. And that study provides a much better proxy of how this operational noise will impact the North Atlantic right whale. But the agencies decided to dismiss those findings. Let me ask you, all these arguments you're making now, you made them. I know you made some presentations before the agency below. These same arguments were presented below, correct? Yes, in general these same arguments, new facts and evidence associated with these arguments were presented here on appeal. However, the basis of these general arguments were presented below, yes. You're relying on new facts in arguing to us that weren't presented to the agency? No, no new facts are reliant, but new authority that we've cited, which contains critical evidence related to entanglements, related to mitigations. You're presenting us data that the agency did not have below originally. Correct. Now let me ask you, you have an opportunity even for the agency to go back at any point if the data changes and have their agency reconsider or change, that's done, is it annually or when is that done? Or periodically, correct? When is it done, you said? Yes, or what can it be done if there's new data? Yes, that's correct. Once new data is deemed appropriate for inclusion in the environmental review, they will begin the reconsultation process. And when would that be? A month from now, a year from now, or as soon as possible? That would likely be within six to 12 months. Okay, and let me ask you, isn't that the better forum to bring all this new data you're relying before us than us as a court? Well, not necessarily because the project, given its present status, is already approaching a critical threshold where a continued forward movement and operation of this project will produce severe harms to the North Atlantic right whale. So we are seeking more urgent stoppage of this. What's your basis for saying that we should be able to consider data that was not presented to the agency? The basis was outlined in the briefing that new authority can be introduced on appeal. Well, new case law, sure, but you're saying we should consider new data. What basis do you have for saying that a court of appeals in considering a challenge to an agency ruling can rely on data that wasn't even presented to the agency? Well, the data that we presented was, in fact, challenged in the notice of intent to sue letters, and many of those arguments that were contained in the appellant's brief were highlighted in the notice of intent to sue letters. They challenged those as far as the efficacy of the mitigation protocols. Although the exact verbiage was not there, the basis of those claims was contained in the notice. For many of them? Specifically for the mitigation protocol issue, the data points that we cited, those were contained. The mitigation itself, the measures, the notice of intent to sue letter contains points about the ineffectiveness of the mitigations. Does that clarify? Well, it sounds like we have to look at your brief again with reference to what you filed before the agency and figure out which of the many ones that you raised there and which are the ones you didn't. Well, the exact citations of the paragraphs were contained in our reply brief regarding that letter, the notice of intent to sue letter. All right. Are there any more questions? No. Thank you. Attorney Hanson-Young, please introduce yourself for the record. You have a ten-minute argument. Good morning. My name is Tekla Hanson-Young, and I represent the United States. With me is Mr. Steenland, who represents Vineyard Wind, and he will be speaking for five minutes. Counsel, let me just ask you at the outset before your time starts running so I don't cut your time. I asked counsel the question, and it's more appropriate for the agency. Should the plaintiffs have new data, the agency is, I take it from my experience with other agencies, they are open periodically to review that data, and if that data should be inconsistent favorably to the plaintiffs, but what would the agency decide? The agency can always stop everything, can change its course of action, or can do that, correct? Yes, that's right. And here we have several mechanisms under which the agency can do that. So if the plaintiffs identified a new study that they wanted the agency to consider, they could always write to the agency and ask them to reconsider it, write right to BOEM, ask them to reevaluate the construction and operations plan, write to NIMPS, ask them to look again at the ESA analysis, and also we have a very specific process that has started here, which will give the agencies another opportunity to look at at least some of the impacts, and that Vineyard Wind has applied for a new incidental harassment authorization under the Marine Mammal Protection Act in order to complete the construction of the wind project, and there will be an opportunity again for the plaintiffs to submit comments on the proposed incidental harassment authorization. More specifically, the buy-up included 10 different recommendations to your agency about monitoring as the project goes forward. Yes. They are only recommendations. Is there anything in the record that shows that your client has adopted those recommendations and will follow them and continue to monitor what happens to the right whales as this project goes forward? The Bureau of Ocean Energy Management required Vineyard Wind to adopt extensive monitoring procedures going forward. I don't have the record sites handy. I'm happy to supply that in a supplemental letter of authority to the court if that's of interest, but it would be in the conditions of approval to the construction and operations plan. No, I think we're talking about two different things, and I would appreciate a 28-J letter. Sure. What is the, if I may ask, what is the recommendation? If you go back to your buy-up, the most recent one, support research and development in aid of minimization of risk of vessel. If I go through all 10 of them, we're going to spend the entire time doing this. Sure, I'm happy to look. That is separate from the COP approval, which includes certain monitoring and reporting requirements. Do you have the page of the buy-up handy? That would be all I would ask for. If you don't, that's fine. The record site I have is supplemental appendix 767268. Okay, got it. Thank you. Let me just put it in context. In the Housatonic case, which was the cleanup of that river after GE put PCBs into the river, EPA built in certain monitoring requirements, which would require, if they showed reason to think that the requirements they had imposed were insufficient, both the collection of data and a prompt response. This is a different situation because it's not an ongoing cleanup effort. It is approval of a specific project. But, of course, as counsel has argued, they're concerned about the ongoing impact of the project as it becomes operational. So I ask my law clerk to go in and see what the continuing, you get the idea. I do. I have two points, even though I don't have a record paid for you. I have two points in response to your concerns. First is the plaintiffs haven't actually raised this as a challenge or raised the post-construction monitoring procedures as a reason why the agency's approval of the project was invalid. And so that would not supply a reason for the court to invalidate the permit or the biological opinion that was issued here. Now, I would also, my second point is that there were a variety of monitoring measures that the agency did, in fact, require of the agency. I would need to go back and look and compare and see which of these were required by BOEM as a condition of the project approval. But the important point is that the only take that the agencies found would occur from this project, both construction and operation of the project, was due to the pile-driving noise during the construction itself, which would be time-limited, will be done by the end of the summer, and would result in the take of only up to 20 right whales through the noise impact, so the impacts of the pile-driving noise. And then the agencies required an extensive suite of minimization and avoidance measures to ensure that those impacts would be minimal. Yes, but they also say you're going to put up turbines, and there's at least one study that suggests the noise from the turbines will be much greater than was represented to the agency. So not all of it is moot, even if part of it is moot. I understand. And I think Your Honor is referring to the Stover study that the plaintiffs point to. The agency specifically considered that study, which itself acknowledged that its methods were not certain and couldn't be necessarily used to predict noise impacts elsewhere, and also noted that operational noise from turbines is generally less than ambient noise. So the agency, even if it had relied on the Stover study, which it decided was not the best available science, would not have reached a different conclusion here that the operational noise would have caused impacts that would have resulted in additional take. A third question, to the point my two colleagues have raised, about the data that is being presented to us but was not presented to the agency. Is there an easy way for us to separate out? Yes. The two instances that my friend, Mr. Stavula, pointed to are the citations to two different cases that discuss the use of protected species observers and passive acoustic monitoring and cite the efficacy rates of 25 and 9 percent. Those are monitoring plans that were used for a different project by the Navy in detecting whale using sonar in a different area of the United States. This project will have had a different plan developed for it that would have been subject to approval, was subject to approval by the agency. And so we can't necessarily say that the rate of efficacy was the same. And the problem is that the plaintiffs didn't actually raise those rates, those efficacy rates, to the agency in the public comment process. And so I can't point you to a response to a comment in the record that shows where the agency discusses the exact efficacy rates. But even if they were raised at some point, as long as they were raised at some point and the agency decides it is, it's still agency rulemaking, correct? Yes. Well, this wasn't rulemaking. But here it wasn't even presented to the agency for purpose of the permit. That's correct. But I would say that even, so that's an easy way to just say, look, it wasn't ever raised, the agency can't bring it up now in court. When they did, in fact, participate in the administrative process. I would also say the second reason why the court can dispose of that argument is that the agency does talk about how the use of passive acoustic monitoring and protected species observers is effective at detecting whales. And some examples of record pages are SA-548, where the agency says passive acoustic monitoring is highly effective. Again, I don't have a percentage, but it's highly effective. Another page is SA-51, where it talks about how the different types of monitoring, which is not only those two types, but there's aerial monitoring as well, the monitoring of the right whale sighting network. And this monitoring goes on, for example, for vessel movements of transporting crew. An area has to be monitored by passive acoustic monitoring for two days before vessels can move, and the area has to be clear. For pile driving, there has to be clear visibility conditions so that an observer can see the whole area before pile driving can commence. So it's really easy to sort of create a soundbite and say, oh, it's only 9% effective. Well, that wasn't this case. That wasn't raised to the agency. And, in fact, it's not true if you look at the record and the comprehensive suite of measures that the agency has adopted. So what the agency is trying to do is to make it, again, you're never going to have a perfect scenario, but the agency is trying to be as humanly perfect, and that's what happens through all the comment period, and that's why all these measures have been taken, correct? That's right. But the agency's goal here was really to look at the type of take that could occur from this project and get it down to the most minimal level that would be possible. And the agencies did that here and determined it was extremely unlikely that there would be any serious injury or death to any right whale, and any impacts that would result from pile driving would be temporary, short-term, and very limited in their nature, would not affect the ability of the species to recover, would not affect any individual whale's fitness or survival. And this court should not second-guess the expert determinations made by the agencies here that were well-founded based on the best available science. If the court has no further questions. And let me also add, again, we have some experience with right whales. Yes. But the agency did take, you said a lot of the pile driving is going to be during the summer months. I think it's during the late winter months that there's more transit and everything. So at least it seems from prior cases we've had that the agency is trying to, you know, let's do it, and there's going to be times for all this. So this is not like start doing it for the next two years and finish this. It's being very meticulously decided how it's going to be done and the phases and everything. The most important restriction or avoidance measure that was required by the agencies here were the seasonal restrictions on construction. And I would direct the court to the graphic at supplemental appendix page 77, which shows all of the right whale sightings in the area, in the wind development area, and in the regions around it during the months when construction is permitted. And you will find that there were no whales sighted in the area where the project will be built during the months that construction is allowed. The whales have been sighted around the project, not in the project area, not in the wind development area, when there is construction. And they have been sighted sometimes in the project or the wind development area, but only in the springtime when construction is prohibited. And so at the very beginning, the agencies required measures to ensure that the impacts to right whales would be as minimal as possible. Thank you. Thank you. Attorney Steenland, you have a five-minute argument. Good morning, Your Honors. May it please the court. I'm Peter Steenland for Vineyard Wind. I'm not quite sure that we're arguing the same case that was briefed because today we're hearing that the agency didn't consider documents that the appellants, the residents, think were so important. In our briefs, we demonstrated in detail, both the government and Vineyard Wind, that these documents were in fact considered. The Quintana Roo study was quoted nine times in the biological opinion. The 2020 report card was the very basis for re-initiating consultation to supplement the original biological opinion. And so after we pointed all these out, the residents filed a reply brief. And you've got to read it really carefully because some of the things they say are, well, the biological opinion didn't say this on page 421 and 422. You're doggone right. It's on 424 and 425. And they say the biological opinion didn't address the irrefragible fact that there were 16 whales that were killed. That's right. There were 17. And that was on page 424. Mr. Streenland, your brief is very effective at pointing out where in the record certain documents said not to have been considered were in fact considered. Is there any document that they say was not considered, which you concede was not considered? I would not say there was no document that was not considered. There was a document that was considered and rejected, and it's the only one. All the other documents are changed. And what was that? That's the discussion on operational noise with Stober versus Elliott. And, Your Honors, that's the classic situation that this Court has addressed time after time, whether it's the Housatonic case cited in our briefs or the Upper Blackstone case cited in our brief, this is where the agency said, we have no immediate study that's directly applicable. So we have to decide what is the best information. And we're going to go with the Elliott study because it addresses Block Island, where the conditions in the ocean, on the ground, in the soil, are most relevant to where we are here. The Stober study, even the authors say, it's got flaws. We can't use it all the time. And so the agency used its expertise and its judgment. And as this Court has said, when you're on the cutting edge of science, you defer to the agency. That's the only one that is in conflict. The rest were all used. Now, I want to go to Judge Lynch's question earlier about whether there's monitoring. Yes, there is. And I would call the Court's attention to page 399 of the supplemental appendix, as well as pages 754 to 756. This is what's called adaptive management. Vineyard Wind has to plan. They share plans with the agency. These are plans for noise monitoring. These are plans for PSOs. These are plans for passive acoustic monitoring. They plan. They test. They report. And they have to verify the effectiveness. As you will see in these record sites, the National Marine Fisheries Service takes that and reserves the right to change the protective measures. They can make these more strict if they need to. It's adaptive management so that, I mean, best example, when the agency decided that Stover didn't work and it was going to go with the Elliott on operational noise, what did they do? They said, we want you to monitor the operational noise for three years and report to us, just to make sure that we've got it correctly. With regard to Judge Lynch's other question, with regard to measures, whether they're approved or not, I would simply say this. There's two kinds of measures. There's the 7A1 measures with regard to conservation. Those are optional. That's a different statutory requirement. But all of the terms and conditions, the reasonable and prudent measures to enforce and support the findings of this determination, are then lifted and picked up and carried over to the Department of the Interior and the Bureau of Energy Management, where they are made part of the permit. So they are enforceable. And if they are not complied with, the Bureau of Energy Management has lots of enforceable tools. Going back to the certificate of approval, there are requirements on Vineyard Winds to do BENCIC monitoring roughly the same time of the year in years one, three, and five. Is that correct? That's correct. And passive acoustic monitoring before, during, and after the platforms are in place for when? Up to three years of operation? Is that the requirement? Yes, that's what I'm referring to. Are there any other study and reporting requirements that I've missed? There are ongoing reporting requirements that are identified, as I indicated, in the conclusion of the biological opinion where the terms and conditions are identified. Again, pages 754 to 756. Those are reporting requirements. I would like to make one other point with regard to the efficacy of PAM and PSOs, if I may. Sure. Opposing counsel has referred to a district court magistrate judge opinion from Northern District of California Pritzker case, where that court quoted the rule. The rule in this case is a term of art. It is the letter of authorization that was given under the Marine Mammal Protection Act to the Department of the Navy to operate for five years. And in that, the Navy or NIMS made these various findings as to the effectiveness of PAM and PSOs. That's site-specific. It has no basis, no bearing on this case. I believe your co-counsel just made that point. Is there anything else? Yes. I would say one other thing, and that is this. Opposing counsel opened his argument by quoting the environmental impact statement and said that there would be no impact on global warming, one way or the other, as a result of this project. And I just have to remember that two years ago, Climate Ambassador John Kerry, in an address in Egypt, said that with regard to our energy and providing clean, renewable energy, the world doesn't care what we say, but it certainly cares what we do. And that's why we're here. NIMS had a very challenging assignment to balance the protections of the whale with the demands of today's climate. I think they did a magnificent job. I think Judge Talwani did a magnificent job. And I think the judgment should be affirmed. Thank you. Counsel, one last thing. And, again, moving forward, besides, you know, whatever the rule in this case is, it is my impression that, you know, or the question to you is, will Vineyard, let's assume the plaintiffs at some point come out with new data, Vineyard's willing to revisit any data along with the Bureau if that should be the case at any point, correct? This is not a slight, you know, assuming you prevail now, this doesn't mean they don't have an opportunity if things happen that you have to change your procedures or anything that it won't be done, correct? Your Honor, we are not constructing right now in part because of the seasonal restriction. But the other factor is that under the Marine Mammal Protection Act, we need a new incidental harassment authorization. Our present one expires in April. We have an application that's pending before the agency. And they can challenge that if necessary. And they can challenge that, and we're hoping that this gets done promptly so we can get back out into the ocean and put up the other 15 monopiles that have yet to be constructed. Is that a hint to us you want a prompt decision? Your Honor, I would not. We have this case. Thank you, counsel. Thank you very much. Attorney Stavola, you have a two-minute rebuttal. Thank you. So first, I would like to note that quotation of a study is not tantamount to adequate usage. At a number of points, it's asserted that these studies are cited, but they're not actually used within the dictionary meaning of that word. And as it pertains to STOBR, the agencies effectively cherry-picked the Block Island Wind Farm, is what transpired here, because the modeling-based data that is utilized, for example, in right whale distribution and acoustic monitoring and pile driving noise, that modeling data was readily accepted. However, the modeling data associated with STOBR was not accepted, notwithstanding the fact that it provides a much better proxy. It studied 10-megawatt turbines and the implications of those turbines. However, the Block Island Wind Farm contained only five turbine generators of six-megawatt capacity. So as a result of that, the assumption that the agencies should receive deference on the operational noise issue is clearly flawed, given the fact that their choice of science in this context is belied by their choices in other contexts where they readily accept modeling data. Now, as it pertains to seasonality restrictions, there's a refusal to note the fact that the Quintana Roo study highlights a seasonal maximum, a secondary maximum in the late summer period. And that was noted in Appellant's briefing, that there's a strong secondary maximum in late summer. And this data was not adequately considered, in addition to the fact that on PAM and PSO, with regard to the intent-to-sue letter, the relevant citation of that letter is ECF 96-3. I don't know if I read the paragraph numbers, but it's contained in the brief. In that intent-to-sue letter, we discuss the many flaws in efficacy of the protocols in terms of PAM and PSO. And with regards to those as well, while the defense asserts that those were utilized in different contexts and in different cases, the modalities were the same. The passive acoustic monitoring measurement technique is the same as used here. So while they attempt to distinguish the two, it remains the same protocol. And furthermore, it should finally be noted that as to entanglement issues, the agencies write off entanglement as a relatively rare event. But that is belied by the data, as we cited in our Appellant's brief. The fact that entanglements are already very high and will be made worse through this project due to pile driving and then operational-based noise thereafter. Thank you. Thank you. That concludes our hearing.